1    Nathan J. Aman, Esq.
     Nevada Bar No. 8354
2    naman@renonvlaw.com
     Jeremy B. Clarke, Esq.
3    Nevada Bar No. 13849
     jclarke@renonvlaw.com
4    FAHRENDORF, VILORIA,
        OLIPHANT & OSTER L.L.P.
5    P.O. Box 62
     Reno, Nevada  89504
6    (775) 284-8888
7
8    Frank J. Wright (TX Bar No. 22028800)
9    *(Pro Hac Vice, Verified Petition Pending)*
     2021 McKinney Avenue, Suite 1600
10   Dallas, Texas 75201
     (214) 999.3000
11   fwright@gardere.com
     Attorneys for Hall CA-NV, LLC
12
13
14
15                 **UNITED STATES DISTRICT COURT**
                      **DISTRICT OF NEVADA**
16
17   In Re:
18   NEW CAL NEVA LODGE, LLC,                     **Case No:**  3:17-cv-00636-RCJ
     A Nevada Limited-Liability Company;
19                                                **US Bankruptcy Court, District of**
                                                  **Nevada Case No:** BK–16–51282–gwz
20                                      Debtor    **Appeal Ref. No.:** 17-49
21   _____
     HALL CA-NV, LLC, a Texas Limited-            **HALL CA-NV, LLC'S EXPEDITED**
22   Liability Company,                           **MOTION TO STAY**
                                                  **CONFIRMATION ORDER**
23                                   Appellant,   **PENDING APPEAL**
24        vs.
                                                  **HEARING DATE:  TBD**
25   LAWRENCE INVESTMENT, LLC;                    **HEARING TIME:  TBD**
     OFFICIAL COMMITTEE OF
26   UNSECURED CREDITORS,
27
                                     Appellees.
28   _____

                                      -1-

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

Hall CA-NV, LLC (**"Hall"**), Appellant, files this Hall CA-NV, LLC's Expedited Motion to Stay Confirmation Order Pending Appeal Thereof (the **"Motion"**) in connection with the Order Confirming the First Amended Plan of Liquidation for New-Cal Neva Lodge, LLC Jointly Proposed by Lawrence Investments, LLC and the Official Committee of Unsecured Creditors Dated August 16, 2017 [Bankruptcy Case Docket No. 966][1] and the Findings of Fact and Conclusions of Law in support thereof [Bankruptcy Case Docket No. 965] (collectively, the **"Confirmation Order"**) and the Order Conditionally Granting Motion to Approve Non-Material Plan Modification [Bankruptcy Case Docket No. 967] (the **"Modification Order"**) and in support thereof would show the Court as follows:

## I.
## SUMMARY

Hall has appealed both the Confirmation Order and the Modification Order arising from the confirmation of a plan of liquidation by the Bankruptcy Court that not only approves the sale of Hall's collateral free and clear of its liens and the liens of other parties (which liens exceed the sales price by almost $10 million) but also approves the sale of property not owned by the Debtor but by a non-debtor that is subject to a pledge agreement in favor of Hall. In so doing the Bankruptcy Court has expanded its jurisdiction beyond the limits of the law and deprived Hall of its bargained for rights with respect to a non-debtor and the property of a non-debtor. Hall seeks a stay of the

---

[1]  Hall has only attached exhibits of key documents it believes are critical to the Court's analysis of this Motion, but will provide any additional documents referenced herein below upon request by this Honorable Court.

Confirmation Order to prevent the sale of both the Debtor's property and the non-debtor's property.

## II.
## BACKGROUND

### A.    The Bankruptcy Case

1.      On July 28, 2016 ("**Petition Date**"), New Cal-Neva Lodge, LLC (the "**Debtor**") filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtor's primary asset is a 191-room resort and casino known as the Cal Neva Lodge & Casino located at 2 Stateline Road, Crystal Bay, Nevada (the "**Resort**").

2.      As of the Petition Date, Hall was owed $24,877,656.55 as evidenced by a proof of claim (Claim No. 28) filed by Hall (the "**Hall Claim**"). The Hall Claim is secured by a first lien on the Resort and substantially all of the assets of the Debtor (the "**Collateral**").

3.      The Hall Claim continues to accrue interest, attorneys' fees, and costs. As of August 31, 2017, the Hall Claim was $29,334,783 and the Hall administrative claim for post-petition advances was $917,577 (inclusive of interest) for a total of $30,252,360.

4.      The Resort is also encumbered by liens that are junior to Hall. Those liens include liens respectively asserted by Ladera Development LLC ("**Ladera**") and by Penta Building Group, Inc. ("**Penta**") and its subcontractors.

5.      In addition to the Resort, the Debtor owns 100% of the membership interests in an entity called CR Lake Tahoe, LLC ("**CR Lake Tahoe**") which in turn owns 100% of the membership interests in 9898 Lake, LLC ("**9898 Lake**"). Neither CR

Lake Tahoe nor 9898 Lake is the subject of a bankruptcy proceeding. 9898 Lake owns a house and land on Lake Tahoe known as the "**Fairwinds Estate**".

6.      Hall is party to a Pledge Agreement entered into with CR Lake Tahoe pursuant to which CR Lake Tahoe pledged to Hall as security the membership interests in 9898 Lake. A true and correct copy of the Pledge Agreement is attached hereto as **Exhibit "1"**. Pursuant to the Pledge Agreement, Hall's consent is required to the transfer of the Fairwinds Estate. Hall has not consented to the sale of the Fairwinds Estate and the Bankruptcy Court in confirming the Plan has authorized the sale over Hall's non-consent.

**B.     The Disclosure Statement and Plan**

7.      On August 7, 2017, Lawrence Investments, LLC ("**Lawrence**") and the Official Committee of Unsecured Creditors (the "**Committee,**" together with Lawrence, the "**Plan Proponents**") jointly filed the Disclosure Statement [Docket No. 762] (the "**Disclosure Statement**") and accompanying plan [Docket No. 761] (the "**Plan**").

8.      August 21, 2017, the Plan Proponents filed a First Amended Plan of Liquidation [Docket No. 803] ("**Amended Plan**") with an Addendum to First Amended Plan [Docket No. 806], a Disclosure Statement for First Amended Plan of Liquidation [Docket No. 802] (the "**Amended Disclosure Statement**")[2], with an Addendum to Disclosure Statement for First Amended Plan of Liquidation [Docket No. 807]. On that same day, the Court entered the Order Approving the Committee of Unsecured Creditors of New Cal-Neva Lodge, LLC and Lawrence Investments, LLC's Disclosure Statement,

---

[2]  The Amended Disclosure Statement is attached as Exhibit "E" to Hall's Ex Parte Motion for Order Shortening Time, and in the interest of Judicial economy, has not been attached hereto.

Setting Dates for Ballot Solicitation, and Confirmation [Docket No. 809] setting forth certain dates and deadlines related to, among other things, the Amended Plan.

9.    The Amended Plan provided for the sale the Resort and other non-estate property at an auction (the "**Sale**"), subject to the stalking-horse bid of Lawrence. The Amended Plan defined Lawrence's "**Purchase Price**" for the Resort and non-estate property as cash in the amount of $35.8 million with an additional $2.2 million being funded by Lawrence classified separately as a "**Plan Payment**." None of the Plan Payment funds will be used to pay secured claims of the Debtor's bankruptcy estate. Rather, the funds are slated to be distributed as follows (as quoted from the Amended Plan):

(a)    unsecured priority tax claims;

(b)    priority non-tax claims;

(c)    general administrative expense claims (estimated at $230,000);

(d)    defaults on the Allowed Secured Claim of Capital One (estimated at $500,000);

(e)    cure amounts for ay default under those Assumed Executory Contracts listed in [Plan] Section Four, subsection A . . . (estimated at $150,000);

(f)    tax liens on the Fairwinds Estate (estimated at $35,000);

(g)    unsecured convenience claims (estimated at claims of $750.00 or less);

(h)    $50,000 to establish a Lien Litigation Trust;

(i)   $25,000 as a reserve for a Plan Administrator and for post-Effective Date U.S. Trustee fees; and

(j)   A fund for Allowed professional fees, in the amount of (1) $1,200,000, plus (2) the difference, if any, between $1.0 million and the amounts necessary to satisfy items (a) through (i) above.[3]

10.   The Amended Plan states that claims asserted by secured creditors (collectively, the "**Secured Creditors**") total $52,950,831.[4] This $52,950,831 number includes Hall's claim in the alleged amount of $29,046,005; as set forth above, the Hall claim, inclusive of interest and post-petition advances, is actually $30,252,360 as of August 31, 2017. In any event, the Amended Disclosure Statement is instructive because it demonstrates the Plan Proponents' acknowledgement that the total secured debt far exceeds the sale price in the Amended Plan.

**C.   Hall's Objections to the Disclosure Statement and the Amended Plan**

11.   On August 11, 2017, Hall filed an objection to the Disclosure Statement [Docket No. 776] (the "**Hall Disclosure Statement Objection**"). The Hall Disclosure Statement Objection principally focused on issues related to adequate information under Bankruptcy Code section 1125. However, Hall also included confirmation objection matters on the basis that a disclosure statement should not be approved if it describes a patently unconfirmable plan.

---

[3]   Amended Disclosure Statement at p. 4. Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Amended Disclosure Statement and Amended Plan.

[4]   *See* Amended Disclosure Statement at p. 21.

12.     On September 12, 2017, Hall filed an objection to the Amended Plan [Docket No. 876] (the "**Hall Confirmation Objection**"). The Hall Confirmation Objection principally focuses on whether the Amended Plan should be confirmed pursuant to section 1129 due to the fact that the Amended Plan is not fair and equitable, violates the absolute priority rule, was not proposed in good faith, contravenes state law with respect to Hall's rights, and attempts to extend the subject matter jurisdiction of this Court to non-estate property. A true and correct copy of the Hall Confirmation Objection is attached as **Exhibit "2"**.

**D.     Confirmation of the Amended Plan**

13.     On September 14, 2017, the Bankruptcy Court conducted a hearing (the "**Confirmation Hearing**") at which the Amended Plan was confirmed over the objections raised in the Hall Confirmation Objection. As a result, the Court entered the Confirmation Order. Paragraph 37 of the Confirmation Order specifically incorporates the language of § 363(m) and provides that "[t]he reversal or modification on appeal of the authorization provided herein to transfer the Purchased Assets to the Buyer pursuant to the Plan shall not affect the validity of such transfers … unless such authorization and such transfers are duly stayed pending such appeal." A true and correct copy of the Confirmation Order including the findings in support thereof is attached as **Exhibit "3"**. A true and correct copy of the Transcript of the Confirmation Hearing is attached as **Exhibit "4"**.

14.     On October 3, 2017, the Bankruptcy Court conducted a hearing on the Plan Proponents' Motion to Approve Non-Material Plan Modification [Docket No. 924]

("Plan Modification") and entered the Modification Order on October 18, 2017. The Modification Order exculpates the Debtor's officers from their actions in transferring the Resort and the Fairwinds Estate, property not owned by the Debtor. A true and correct copy of the Modification Order is attached as **Exhibit "5"**.

15.     On October 18, 2017, Hall filed its *Notice of Appeal* regarding the Confirmation Order based on the arguments raised in the Hall Confirmation Objection and argued at the Confirmation Hearing. Through this Motion and that appeal, Hall seeks to prevent the scenario in which the Purchased Assets – inclusive of non-estate property - are transferred pursuant to the Confirmation Order before the Court or any court sitting on appeal has an opportunity to determine whether a stay should be imposed.

**E.     Denial of Motion for Stay Pending Appeal     by the Bankruptcy Court**

16.     On October 18, 2017, Hall filed Hall CA-NV, LLC's Motion to Stay Confirmation Order Pending Appeal Thereof [Bankruptcy Case Docket No. 980] ("**Hall's First Stay Motion**"). The Bankruptcy Court set the motion for hearing on October 20, 2017 at 10:00 a.m.

17.     On October 20, 2017, the Bankruptcy Court denied Hall's First Stay Motion but extended the stay of the Confirmation Order for an additional two days until October 25, 2017 at 5:00 p.m. Once the stay expires, Lawrence can immediately proceed to close on the purchase of the Resort and the Fairwinds Estate. Hall requested that the Bankruptcy Court extend the stay for an additional seven days from October 23 to allow ample time to seek a stay from this Court, but the Bankruptcy Court refused to extend the stay for more than two days. While the Bankruptcy Court has made an oral ruling, no

order has been entered yet on Hall's First Stay Motion. Notwithstanding the fact that no Order has been entered, the stay expires at 5:00 p.m. on October 25, 2017. Expedited consideration by this Court is therefore crucial. An *Ex Parte Motion for Order Shortening Time* has been filed contemporaneously herewith, and as set forth therein, Hall would request that this Court set a hearing on or before October 25 to consider Hall's request for stay pending appeal, of if this Court's calendar will not permit a hearing in time, extend the stay beyond October 25 to allow full and fair consideration of this Motion and Hall's request for stay.

### III.

### <u>ARGUMENTS AND AUTHORITIES</u>

18.     Pursuant to Federal Rule of Bankruptcy Procedure 8007(a)(1), a party seeking a "stay of a judgment, order , or decree of the bankruptcy court pending appeal," must first move in the bankruptcy court for such relief. "The standard for evaluating stays pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction."[5] Here, Hall seeks to stay the Confirmation Order entered by the Court on October 16, 2017.

19.     Bankruptcy Rule 8007 gives the Court broad discretion to issue a stay or any other appropriate order during the pendency of an appeal, and in exercising this discretion many courts typically consider four factors in evaluating the appropriateness of a stay pending appeal of a bankruptcy court order: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant

---

[5]   *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir.1983).

will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[6] Courts generally balance these factors on a sliding scale, where a strong showing on one factor may offset a weaker showing on another.[7] The first two factors, however, are the most critical.[8]

20.    While agreeing that a preponderance of the evidence is the standard an appellant must meet in seeking a stay pending appeal, the Bankruptcy Court voiced some disagreement with the sliding scale approach where a substantial showing of one of the four factors (generally, irreparable harm) can counterbalance or compensate for a weaker showing on another factor. The Bankruptcy Court, consistent with its own prior published opinions, reiterated that raising the specter of irreparable injury along is insufficient to stay a patently fruitless appeal. In this case, while Hall maintains that a flexible, sliding scale analysis of the four-factors is the more prudent approach, whether this Court weighs irreparable harm and a likelihood of success on the merits as relative weighted components of a four-part analysis or as more akin to 50/50, the result is the same. Hall is not "rais[ing] the specter of irreparable injury to trump the [bankruptcy] court's order," or to prop up a spurious appeal.  Hall's appeal is not fruitless; the appeal

---

[6]  *See Wymer v. Wymer (In re Wymer)*, 5 B.R. 802, 806 (9th Cir. BAP 1980); *Nken v Holder*, 556 U.S. 418, 434 (2009); *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

[7]  *See Levia–Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)); *Mich. Coalition of Radioactive Material Users, Inc. v. Gripentrog*, 945 F.2d 150, 153 (factors are "interrelated considerations that must be balanced together.").

[8]  *Nken*, 556 U.S. at 434.

-10-

raises serious issues of law concerning §1129(b)(2)(A)(ii) and the scope of a bankruptcy court's jurisdiction. A stay to ensure appellate review is appropriate.

21.    In this case, all four factors support a stay of the Confirmation Order. First, Hall is likely to prevail on the merits of its appeal because under the terms of the Amended Plan the Bankruptcy Court purports (a) to exercise jurisdiction over assets that are not property of the bankruptcy estate and do not belong to the Debtor, and (b) to authorize their transfer in violation of Hall's rights under the Pledge Agreement. This exceeds Congress's jurisdictional grant in section 1334, and the Confirmation Order should be overturned. Further, under the terms of the Amended Plan, Hall is being deprived of a portion of the sales proceeds resulting from the sale of its collateral, the so-called "Plan Payment" which is being paid to creditors junior to Hall.

22.    Second, the immediate applicability of the Confirmation Order (and through it, the terms of the Amended Plan) in a mere two days will undoubtedly could lead to the immediate consummation of the Amended Plan itself – including closing of the Sale transactions contemplated therein – in an effort to moot any argument presented against it. The inclusion of the language in paragraph 37 of the Confirmation Order magnifies this risk by insulating the contemplated transactions from any meaningful appellate review absent a stay. If that occurs, Hall will suffer irreparable harm. Hall cannot take the risk that the Amended Plan becomes effective without seeking a stay pending appeal and has properly done so as expeditiously as possible under the extremely short timeframe established by the Bankruptcy Court. If the Confirmation Order is not stayed and the Sale allowed to close, Hall will forever be deprived of the exercise of its rights

under its Pledge Agreement – the right to consent or not consent to the sale of the Fairwinds Estate – will lose its lien rights on unique real property, and be forever divested of its rights to receive the proceeds of the sale of its Collateral once the Plan Payment is disbursed.

23.     Third, no other interested party (including the Plan Proponents) will be substantially injured by a stay allowing Hall to seek appellate review of the propriety of the Confirmation Order. The Resort will remain in its present secure and guarded circumstances, and the necessary roof repair work may proceed per the Bankruptcy Court's order authorizing the roof repair irrespective of the Appeal and any stay of the Confirmation Order incident thereto. Any delay on a distribution of the Plan Payment funds cannot reasonably be said to equate to a substantial injury, and regardless, any incidental injury that does result from that stay will be substantially outweighed by the irreparable harm to Hall from not granting the stay. The balance of the equities clearly weighs in favor of granting the stay to allow proper appellate review.

24.     Finally, the public interest weighs heavily in favor of the recognition of the parties' state-law rights, including the right of Hall to prevent any sale of the Fairwinds Estate from taking place absent its consent. The public interest is best served by proper appellate review of the arguments raised in this Motion and the Hall Confirmation Objection.

**F.    Hall is Likely to Prevail on the Merits of Its Appeal**

25.    As the Ninth Circuit has explained, "The first showing a stay petitioner must make is "a strong showing that he is likely to succeed on the merits."[9] Courts routinely use different formulations to describe this standard, but it is clear that applicants need not demonstrate that it is more likely than not that they will win on the merits. Instead, applicants must show a "reasonable probability" of success, "a substantial case on the merits," or that "serious legal questions are raised."[10] Hall has shown by a preponderance of the evidence a better than "reasonable probability" of success on the merits, and this case presents serious legal questions requiring appellate consideration.

26.    The Hall Confirmation Objection sets forth in detail Hall's legal arguments for why the Amended Plan never should have been confirmed in the first place. Rather than restate such arguments here in their entirety, the following constitutes a summary of certain of those arguments for the benefit of the Court reviewing this Motion.

*i.    The Amended Plan Strips Hall's Rights and Remedies Under State Law in Violation of Section 1129(a)(3)*

27.    The Amended Plan purports to transfer non-estate assets — the Fairwinds Estate — in direct contravention to the negotiated state law contract rights between two non-debtors: Hall and CR Lake Tahoe. The Confirmation Order is therefore directly contrary to the contractual terms between two non-debtor parties. This denies Hall its negotiated rights and remedies under state contract law, and violates section 1129(a)(3) of the Bankruptcy Code. It should be noted that the Bankruptcy Court repeatedly noted at

---

[9]    *Leiva*, 640 F.3d at 966 (quoting *Hilton*, 481 U.S. at 776) (quotation marks omitted).

[10]    *Id.* at 967-68 (quoting *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010); *Hilton*, 481 U.S. at 778; and *Abbassi v. INS*, 143 F.3d 516 (9th Cir. 1998)).

the Confirmation Hearing and the hearing on the Plan Modification that the sale of the Fairwinds Estate was troublesome:

> "The Fair Winds issue is troublesome to me" (Transcript of Confirmation Hearing on 9/14/17 at page 234, line 4)
> "I thought there were strong arguments that were made by both Hall and Paye regarding those provisions that were in the plan. I truly have very little problems with any other portion of that plan, but I have considerable angst over the Fairwinds proposal." (Transcript of Hearing on Plan Modification dated 10/3/17 at page 10, lines 14-18)
>
> "I think the direct transfer has serious problems, and not only because of whatever interest the Payes may have, but also because of the rights that exist in favor of Hall pursuant to the pledge agreement." (Transcript of Hearing on Plan Modification dated 10/3/17 at page 32, lines 14-17)

28.     Next, Capital One Bank (USA), N.A. ("**Capital One**") is included among the parties to receive a portion of the Plan Payment pursuant to the Amended Plan. Capital One, however, is not a creditor of the Debtor and to the extent it has a lien on the Fairwinds Estate, such lien is on non-estate property. In approving such payment, the Confirmation Order ignores the corporate distinctions between the Debtor and 9898 Lake, LLC, the non-debtor entity that owns the Fairwinds Estate, and contravenes the Debtor's own language in the Amended Disclosure Statement, which recognizes that "the transaction [whereby CR Lake Tahoe took its interest in 9898 Lake] was structured . . . to allow Hall to possess a lien or security interest against the Fairwinds Estate or [the Debtor's] membership interest in 9898 Lake."[11]

29.     The Bankruptcy Court's purported exercise of jurisdiction over 9898 Lake's property also directly contravenes the Pledge Agreement. As noted above, the Pledge Agreement, the Debtor's subsidiary, CR Lake Tahoe, pledged 100% of its membership

---

[11]   Amended Disclosure Statement at p. 18.

interests in 9898 Lake to secure the Debtors' loan obligations to Hall.[12] The Pledge Agreement explicitly prohibits CR Lake Tahoe from transferring the exact non-estate assets that are contemplated to be transferred in the Amended Plan. This attempted transfer constitutes an event of default[13] that allows Hall to "elect to become a substituted member in the Company with respect to the Pledged Collateral," and requires CR Lake Tahoe to "execute or cause to be executed all documents necessary to evidence [Hall] so becoming a substituted member."[14]

30.    The Confirmation Order breaches these provisions of the Pledge Agreement by stripping Hall of its rights and remedies under the Pledge Agreement. The Plan Proponents provided no legal basis for using this Court as an instrument to breach the contractual agreement between non-debtor parties involving non-estate property, or denying Hall its negotiated rights and remedies, each of which is grounded in state contract law. The Court should have determined that vitiating the terms of the contract under such circumstances was "forbidden by law" in violation of Bankruptcy Code section 1129(a)(3).[15]

ii.    *Inclusion of Non-Estate Property and a Non-Creditor in the Plan is Contrary to the Court's Jurisdiction*

31.    In addition, the Confirmation Order stretched the Bankruptcy Court's jurisdiction beyond its breaking point by addressing the claim of a non-creditor and

---

[12]  Pledge Agreement at p. 2.

[13]  *Id.* at p. 8.

[14]  *Id.*

[15]  *See In re Jandous Elec. Constr. Corp.*, 115 B.R. 46, 51 (Bankr. S.D.N.Y. 1990) (noting that a "Chapter 11 plan must comply with all applicable law, not merely bankruptcy law."); *see also In re Dapontes*, 364 B.R. 866, 867 (Bankr. D. Conn. 2007) ("The 1129(a)(3) prohibition is expansive, i.e., it includes both federal and any other applicable law.").

bringing non-estate property into this matter. The Supreme Court has made clear that Congress "vested 'limited authority' in bankruptcy courts" and, accordingly, related-to subject matter jurisdiction must have it limits.[16] The Ninth Circuit follows the well-accepted standard that there is related-to subject matter jurisdiction where the matter sought to be administered could conceivably have an effect on the bankruptcy estate.[17] Based on this foundation, courts have held that "a bankruptcy court does not have jurisdiction in controversies between third parties <u>not involving the debtor or property of the estate</u>."[18] To that end, the property of a debtor's non-filing subsidiary does not constitute property of the debtor's bankruptcy estate.[19]

32.    In this case, the Plan Proponents are hanging their jurisdictional argument on the fact that the Debtor and 9898 Lake have a common owner. That is not enough for related-to subject matter jurisdiction. 9898 Lake is not a debtor and its property is not property of the Debtor's bankruptcy estate subject to disposition by the Bankruptcy

---

[16]    *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (quoting *Board of Governors, FRS v. MCorp Financial, Inc.*, 502 U.S. 32, 40 (1991)).

[17]    *In re Fetz*, 852 F.2d 455, 457 (9th Cir. 1988) (adopting the standard set forth by the Third Circuit in *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984)).

[18]    *In re Casamont Investors, Ltd.*, 196 B.R. 517, 521 (9th Cir. BAP 1996) (emphasis added); *see also In re REDF Marketing, LLC*, 536 B.R. 646, 663 (Bankr. W.D.N.C. 2015) (noting that a bankruptcy court's jurisdiction is not "limitless" and that a "vast majority of cases" have found no jurisdiction over third party non-debtor matters).

[19]    *See, e.g., Spring Real Estate, LLC v. Echo/RT Holdings, LLC*, No. CV 7994-VCN, 2016 WL 769586, at *3 (Del. Ch. Feb. 18, 2016) (noting that courts first look to state law to determine whether a debtor has an interest in property and that under state law the "property of a debtor's estate generally does not include the property of the debtor's non-filing subsidiaries . . . This distinction flows from the basic principle under state corporate law that a corporation is a separate legal entity from its shareholders."); *In re Am. Int'l Refinery*, 402 B.R. 728, 742 (Bankr. W.D. La. 2008) (same); *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) (same).

Court over the express objection of Hall. The Bankruptcy Court has no ability to exercise jurisdiction via the Amended Plan over such non-estate property.

33.     In addition, under the Modification Order the Bankruptcy Court is granting the Debtor's officers exculpation from their act in transferring the Fairwinds Estate in violation of the Pledge Agreement. However, the Debtor's officers in so signing the documents transferring the Fairwinds Estate are signing on behalf of 9898 Lake, not the Debtor, in direct breach of the Pledge Agreement. Yet the Modification Order insulates them from liability further depriving Hall of its state law rights.

iii.    *The Amended Plan is Not Fair and Equitable Because it Does Not Provide Hall and Other Secured Creditors with the Indubitable Equivalent of Their Collateral*

34.     The Amended Plan purports to sell the Resort free and clear of liens, claims, and encumbrances of Secured Creditors. Bankruptcy Code § 1129(b)(2)(A)(ii) requires that, in order to sell assets free and clear, a secured creditor must either: (x) retain its liens on the assets[20] *and* receive deferred cash payments via an interest-bearing note;[21] *or* (y) be provided the indubitable equivalent of its claims.[22] To state that concept using subsections of the Code, in order to sell free and clear of liens pursuant to § 1129(b)(2)(A)(ii), a proposed Chapter 11 plan must treat those liens "under clause (i) or (iii) of this subparagraph." In other words, § 1129(b)(2)(A)(ii) requires compliance with either subparagraph (i) or (iii).

35.     The Amended Plan clearly does not give Hall and the other Secured Creditors post-Sale liens on the Collateral to the extent of the allowed amount of the

---

[20]   11 U.S.C. §1129(b)(2)(A)(i)(I).

[21]   *Id.* at § 1129(b)(2)(A)(i)(II).

[22]   *Id.* at § 1129(b)(2)(A)(iii).

Secured Claims *and* provide interest-bearing notes yielding deferred cash payments totaling at least the allowed amount of the Secured Creditors' claims. Hall's liens are not treated "under clause (i)," therefore the Amended Plan does not satisfy § 1129(b)(2)(A)(i)(I) and (II).

36.    Therefore, to comply with § 1129(b)(2)(A)(ii), the Plan Proponents <u>must</u> demonstrate that Hall's liens are being treated "under clause (iii)" - the Amended Plan must provide Hall and the other Secured Creditors with the indubitable equivalent of their claims.

37.    The term "indubitable equivalent" is not defined in the Bankruptcy Code[23]; however, case law has interpreted the term to mean "too evident to be doubted."[24] The burden of demonstrating whether the indubitable equivalence standard has been met with respect to substituted collateral has been described as much higher than merely preponderance of the evidence.[25] In the situation where the collateral is surrendered to a

---

[23]   The concept pre-dates the Bankruptcy Code and was originally coined by Judge Learned Hand in *In re Murel Corp.*, 75 F.2d 941 (2d Cir. 1935). *See In re Philadelphia Newspapers, LLC.*, 599 F.3d 298, 310 (3d Cir. 2010) (discussing the origin of the term).

[24]   *In re Richfield 81 Partners II, LLC*, 447 B.R. 653, 656 (Bankr. N.D. Ga. 2011); *see also In re Investment Co. of the Southwest, Inc.*, 341 B.R. 298, 324 (10th Cir. BAP 2006) (stating that the indubitable equivalence standard requires "both the absence of any reasonable doubt that the secured creditor will receive the payments to which it is entitled, and that the changed forced upon the objecting creditor are 'completely compensatory,' meaning that the objecting creditor is fully compensated for the rights it is giving up."); *In re Swiftco, Inc.*, No. 85-07083-H1-5, 1988 WL 143714, at *12 (Bankr. S.D. Tex. Oct. 5, 1988) ("One basic prerequisite in a determination of indubitable equivalence is that the equivalence simply must be beyond doubt.")

[25]   *In re Prosperity Park, LLC*, No. 10-31399, at *4 (Bankr. W.D.N.C. May 17, 2011) ("This burden is more than a mere preponderance of the evidence and more than even beyond a reasonable doubt, but rather the indubitable equivalence of a cash payment on the date of confirmation."); *see also In re Ponce de Leon, 1403, Inc.*, 523 B.R. 349, 371 (Bankr. D. P.R. 2014) (stating that the burden is akin to clear and convincing); *In re B.W. Alpha, Inc.*, 100 B.R. 831, 833 (Bankr. N.D. Tex. 1988) (same).

secured creditor, courts have held that it is possible for such a surrender to meet the indubitable equivalence standard because it cannot be doubted that the indubitable equivalence of collateral is the collateral itself.[26] Critically, however, such "dirt for debt" arrangements do not involve any court or outside expert valuations of the collateral. Rather, the property is simply surrendered.[27]

38.     This is not a "dirt for debt" case; the Amended Plan does not surrender the property to the secured creditors. Moreover, the Amended Plan diverts $2.2 million of the sale proceeds as a Plan Payment and thus does not pay the secured creditors all of the proceeds from the sale of their Collateral. The Plan Proponents' only reasonable basis for classifying the Plan Payment as something other than sale proceeds is for the Plan Proponents to assert that the $35.8 million Purchase Price constitutes Lawrence paying what the Collateral is worth. For that reason, the argument goes, the secured creditors are collectively entitled only up to $35.8 million pursuant to Bankruptcy Code section 506(a)(1). In order to accept that argument, this Court must make a determination that a cash payment of $35.8 million truly is the indubitable equivalence of a lien on the Collateral. This requires a judicial determination of value since there is no way around the indubitable equivalence requirement. As set forth above and in the related case law, the

---

[26]   *RadLAX Gateway Hotel LLC v. Amalgamated Bank*, 132 S.Ct. 2065, 2072 (2012) (stating that one example of indubitable equivalence is where "the creditor receives the property itself").

[27]   *See, e.g.*, *In re Arnold and Baker Farms*, 85 F.3d 1415 (9th Cir. 1996) (overturning the bankruptcy court's finding of "indubitable equivalence" where secured creditors received parcels valued at more than each such creditor's claim due to the fact that the entire real estate was not surrendered). *See also*, *In re Martindale*, 125 B.R. 32, 39 (Bankr. D. Idaho 1991) ("[T]he preponderance of the evidence in the form of the appraisers' testimony may demonstrate a property value at a certain dollar amount. However, because of imprecision inherent in this kind of proof, the dollar value shown may not necessarily constitute the indubitable equivalence of a cash payment to the creditor in a like amount.").

inherent uncertainties of such a valuation, by definition, will mean that the ultimate determination of value is not indubitable. Any evidence presented in support of such determination was clearly insufficient, and the Confirmation Order should have never been entered.

39.     In addition, the Secured Creditors, including Hall, are being deprived of the opportunity to gain from a future increase in the value of the Resort.

    *iv.*    *The Amended Plan Was Not Proposed in Good Faith*

40.     Bankruptcy Code section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." The Amended Plan violates both provisions by diverting funds away from Secured Creditors and impermissibly surcharging the Secured Creditors' collateral.

41.     The entire purpose of the Amended Plan is for Lawrence to purchase the Resort and ultimately realize the upside of such property. The Amended Plan, however, does not include the $2.2 million Plan Payment as part of the actual sale proceeds, instead, Lawrence appears to be arguing that the Plan Payment constitutes the amounts necessary to fund the Amended Plan. The mental gymnastics required to conclude that a Plan Payment is not part of the purchase price are untenable and, with respect to the Amended Disclosure Statement, internally inconsistent. Specifically, the Amended Disclosure Statement makes clear that the approximately $900,000 Hall Superpriority Claim will be paid from the $35.8 million Purchase Price, not from the $2.2 million Plan Payment.[28] The Plan Proponents provide no support for why Hall should fund its

---

[28]     *See* Amended Disclosure Statement at p. 44.

superpriority claim out of the collateral securing its claim, and further begs the question of why the Hall Superpriority Claim is not being paid out of the Plan Payment ahead of junior administrative claims?

42.     The only reasonable answer is that the Purchase Price/Plan Payment dynamic was expressly designed to deny Secured Creditors funds they otherwise would be entitled to under the Bankruptcy Code and then gift those funds to the estate professionals and other unsecured creditors. If the Purchase Price for the Resort was (accurately) described in the Amended Plan as $38 million, confirmation would be impossible because secured creditors would be entitled to all of the funds. The Bankruptcy Court should never have endorsed a process designed to deny payment to Secured Creditors.

43.     Additionally, the Committee, with the acquiescence of Lawrence as co-Plan Proponent, is seeking to do via the Amended Plan what the Committee could not otherwise accomplish under the Code: surcharge Hall's and the other Secured Creditors' collateral to pay the fees of estate professionals. The artificial divvying of the price being paid by Lawrence — $38 million, regardless of how the Plan Payment is described — constitutes a blatant attempt to confirm the Amended Plan over the objection of the Secured Creditors, who would otherwise be entitled to the entire purchase price, by paying administrative claims. It further constitutes an impermissible surcharge against Hall's and the other Secured Creditors' collateral by arbitrarily expropriating $2.2 million of the Sale proceeds and diverting a significant portion of any overbid via the Overbid Carve-out. In both situations, the diverted funds would be used to pay, among other

things, professional fees, denying the Secured Creditors funds they otherwise would be entitled to under the Bankruptcy Code.

44.     Moreover, the Amended Plan wholly fails to meet the burden to prove each of the necessary elements to support a surcharge.[29] Section 506(c) of the Bankruptcy Code provides that a "trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."[30] Section 506(c) is an exception to the general rule that the costs of administration of a bankruptcy case be absorbed by the bankruptcy estate.[31] The party seeking recovery on a surcharge claim must prove: (1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the creditor benefited from the expenses.[32] A direct and quantifiable benefit to the secured creditor is required; section 506(c) is not satisfied by "possible or

---

[29]  In addition, the Plan Proponents lack standing under section 506 to seek a surcharge in the first place; only a trustee has standing to bring such actions. *Hartford Underwriters Ins. Co. v. Union Planters Bank* 530 U.S. 1, 14 (2000) *Id.* at 14 ("We conclude that 11 U.S.C. § 506(c) does not provide an administrative claimant an independent right to use the section to seek payment of its claim."); *see also In re GTI Capital Holdings, L.L.C.*, No. BAP AZ-06-1096-PADS, 2007 WL 7532277, at *9 (B.A.P. 9th Cir. Mar. 29, 2007)(quoting *Hartford Underwriters*).

[30]  *Hartford Underwriters*, 530 U.S. at 1.

[31]  *See In re D & M Land Co., LLC*, No. 07-00054, 2010 WL 358525, at *7 (Bankr. E.D.N.C. Jan. 15, 2010), *aff'd sub nom.* 431 B.R. 133 (E.D.N.C. 2010) (*citing Kivitz v. The CIT Group/Sales Finance, Inc.*, 272 B.R. 332, 334 (D. Md. 2000)) ( "As a general rule, administrative costs of a reorganization, including attorneys' fees incurred in connection with efforts to reorganize the debtor, may not be charged against the collateral of a secured creditor.").

[32]  *See In re Cascade Hydraulics and Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir.1987); *see also In re McLendon*, 506 B.R. 243, 249 (Bankr. N.D. Miss. 2013) (citing *New Orleans Public Serv., Inc. v. First Federal Sav. and Loan Ass'n of Warner Robins, Georgia (In re Delta Towers, Ltd.)*, 924 F.2d 74, 76 (5th Cir.1991)).

speculative benefits."[33] Ninth Circuit case law makes it clear that surcharge is a high hurdle and a burden which ought not be easily satisfied.[34]

45.    Even assuming the Amended Plan *could* surcharge the Secured Creditors' collateral, only such amounts that actually and directly benefited Hall's and the other Secured Creditors' collateral could be deducted from the Purchase Price. After such deductions, the secured creditors would receive the entire net Sale proceeds. The provisions of the Amended Plan that divvy up of the Purchase Price, diverting funds away from Secured Creditors through the Plan Payment and the Overbid Carve-out, violate this requirement. Lawrence's cash (or another bidder's cash in the case of the Overbid Carve-out) should go to pay the Secured Creditors' liens against their collateral, not administrative claims. Any attempt to do otherwise circumvents the Bankruptcy Code.

**F.    Hall Will Suffer Irreparable Harm Should the Confirmation Order Not be Stayed.**

46.    Regarding the second element, "[a]n appropriate starting point is to identify what is 'irreparable.' In its most basic sense, irreparable means "incapable of being rectified, restored, remedied, cured, regained or repaired[.]"[35] "Irreparable injury" may be

---

[33]    *D & M Land*, 2010 WL 358525, at *7 (*citing In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1261 (9th Cir.2000)(additional citations omitted).

[34]    "The parties seeking the surcharge must prove that the expenses were reasonable, necessary and provided a quantifiable benefit to the secured creditor. . . This is not an easy standard to meet. It is the party seeking the surcharge that has the burden of showing a 'concrete' and 'quantifiable' benefit.... The § 506 recovery is limited to the amount of the benefit actually proven." *In re GTI Capital Holdings, L.L.C.*, No. BAP AZ-06-1096-PADS, 2007 WL 7532277, at *13–14 (B.A.P. 9th Cir. Mar. 29, 2007)(*citing In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 (9th Cir. 2001)).

[35]    *In re Frantz*, 534 B.R. 378, 389 (Bankr. D. Id. 2015) (citing Black's Law Dictionary 958 (10th ed.2014)).

further defined as "[a]n injury that cannot be adequately measured or compensated by money and is therefore often considered remediable by injunction."[36] Outside the bankruptcy context, the Ninth Circuit has held that the certainty that an appeal will become moot is enough to constitute irreparable injury.[37] Inside the bankruptcy context, the question is admittedly closer;[38] at least one bankruptcy court, however, has equated mootness with irreparable injury where the closing of a sale, combined with a finding that the purchaser was a good-faith purchaser within the meaning of § 363(m), constituted irreparable harm.[39] And further, appellants in the bankruptcy context have legitimately and persuasively argued that the loss of appellate review, in and of is itself, is a form of irreparable injury where any successful outcome to an appeal would likely be rendered moot by the intervening sale of the property.[40] Even the Bankruptcy Court expressly recognized draconian impact of mootness and the intrinsic the value of the right to

---

[36] *Id.* at 906.

[37] *See Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir.1986).

[38] *See, e.g., In re Red Mountain Mach. Co.*, 451 B.R. 897, 908–09 (Bankr. D. Ariz. 2011) (internal citations omitted) ("[T]he law is clear in the Ninth Circuit that irreparable injury cannot be shown solely from the possibility that an appeal may be moot"); *In re Convenience USA, Inc.*, 290 B.R. 558, 563 (Bankr. M.D.N.C. 2003) (stating that "a majority of the cases which have considered the issue have found that the risk that an appeal may become moot does not, standing alone, constitute irreparable injury" and citing cases).

[39] *In re Gardens Regional Hospital and Medical Center, Inc.*, 567 B.R. 820, 831-32 (Bankr. C.D. Cal. May 15, 2017) (holding that the likelihood of mootness amounted to irreparable harm under the circumstances.).

[40] *Mountain Paradise Village, Inc. v. Federal Nat. Mortg. Ass'n*, 2013 WL 5637931 at *2 (D. Nev. Oct. 15, 2013) ("Appellant persuasively argues that the loss of appellate review itself is a form of irreparable injury where any successful outcome to his appeal would likely be rendered moot by the sale of the property. On this basis, the Court finds that irreparable harm could likely result if the stay is not granted); *Plains Farm Supply v. Tex. Equip. Co. (In re Tex. Equip. Co.)*, 283 B.R. 222, 228 (Bankr. N. D. Tex. 2002) (holding that the mandate of a stay under §363(m) establishes irreparable injury), citing *Ginther v. The Ginther Trusts (In the Matter of The Ginther Trusts)*, 238 F.3d 686, 688-89 (5th Cir. 2001)).

appeal, stating "if parties believe that I have committed error, <u>then they should have their</u> <u>rights to have any decision I make reviewed.</u>" [41]

47.     Here, by design of the Plan Proponents, the potential for mootness becomes an absolute certainty in the absence of a stay of the Confirmation Order. On the one hand, the Confirmation Order expressly provides that is a final order subject to immediate appeal. Yet, absent a stay, paragraph 37 of the Confirmation Order provides that "the reversal or modification on appeal [of the Confirmation Order] shall not affect the validity of [the transfers contemplated therein] unless such authorization and transfers are duly stayed pending such appeal." In effect, the Confirmation Order forced Hall to file an immediate Notice of Appeal, and then expedite a request for stay first from the Bankruptcy Court and now from this Court,  in order to preserve its right to appeal the propriety of the Confirmation Order or risk having those rights mooted by consummation of the Amended Plan. Stated differently, the Confirmation Order appears to show deference to Hall's critical right to appeal by making itself immediately appealable, but then vitiates legitimate appellate review by insulating itself from the effects of reversal or modification.

48.     A successful result on appeal in this case could be a hollow victory due to the provisions of 11 U.S.C. §363(m) and the doctrine of equitable mootness which would insulate a sale in derogation of Hall's contractual and legal rights "unless such authorization and transfers are duly stayed pending such appeal." Indeed, some courts have held that the failure to obtain a stay pending appeal not only prevents a judicial

---

[41]   Transcript of Confirmation Hearing, p. 256(emphasis added).

remedy,[42] but effectively denies review of the Bankruptcy Court's rulings. This is particularly true where, as here, the consummation of the sale at issue will be difficult to unwind and the Confirmation Order itself prevents appellate review from having any real meaning absent a stay.

49.     So what is the irreparable injury to Hall. If the Confirmation Order is not stayed and the Sale closes, Hall's liens on the Resort will be released. This loss of lien on unique real property is irreparable, it cannot be undone. Hall will receive a payment of approximately $20 million at the Sale but will still be owed another $10 million. That $10 million claim will be secured by a lien against the $15 million Lien Litigation Reserve but the liens of Ladera of roughly $9 million and Penta and its subcontractors of roughly $10 million will also be secured by that same Lien Litigation Reserve and Hall will receive no payment on that $10 million claim from the Plan Payment. There is no guarantee that Hall's remaining claim will be paid in full, particularly when Hall is also being forever deprived of the opportunity to be paid from Hall's other Collateral, the membership interests in 9898 Lake because 9898 Lake's asset, the Fairwinds Estate, is also being sold over Hall's objection. The resort is unique real property, the Fairwinds Estate is unique real property, and both are being sold under the Amended Plan in contravention of Hall's rights, resulting in irreparable harm.

---

[42]  *See, e.g., In re Bleaufontaine, Inc.,* 634 F.2d 1383, 1390 n. 14 (5th Cir. 1981) (An appellant is not obliged to seek a stay pending appeal. The only consequence of failing to obtain a stay is that the prevailing party may treat the judgment or order of the referee as final, notwithstanding an appeal is pending. But as a practical matter, situations will arise where what may be done under the order by the prevailing party is beyond the power of the district judge to undo by reversal of the order. In such a case, seeking a stay becomes mandatory. Otherwise, the appeal may be dismissed as moot.) citing 13 Collier on Bankruptcy P 805.04, at 8-53 (14th ed. 1943).

## G.   The Plan Proponents Will Not Be Harmed if a Stay is Granted.

50.   The third factor to consider in determining whether a stay should be imposed is whether issuance of the stay will substantially injure the other parties interested in the proceeding.[43] No interested party – including the Plan Proponents – will be substantially harmed by a stay permitting Hall to seek appellate review of the Confirmation Order.

51.   It is evident that the Plan Proponents seek to close the Sale transaction before Hall or any other party in interest is afforded an opportunity to seek appellate review. That is precisely why the Plan Proponents drafted Paragraph 37 of the Confirmation Order to state that the reversal or modification of the Plan Proponents' authority to transfer the Purchased Assets to the Buyer shall not affect the validity of such transfers. But a stay forestalling the closing of the Sale pending appellate review will not substantially harm the Plan Proponents. The Resort will remain secure, and the necessary roof repair work may proceed unimpeded by the Appeal and any stay of the Confirmation Order incident thereto. Any delay on a distribution of the Plan Payment funds cannot reasonably be said to equate to a substantial injury, and regardless, any incidental injury that does result from that stay will be substantially outweighed by the irreparable harm to Hall from not granting the stay. Through the duration of the case, Hall and other creditors were stayed from foreclosing on their respective collateral. It would be wholly unfair to permit the Sale to go forward immediately without providing Hall the full opportunity to appeal the Confirmation Order and the Amended Plan.

---

[43]   *Nken*, 556 U.S. at 434.

52.     While the Debtor's goal of closing the Sale transaction as soon as possible may be delayed by a stay pending appeal, such delay cannot amount to "substantial" injury to the Debtor. The record at the confirmation hearing cannot support a finding of harm to the Debtor or any other party by a stay of the Confirmation Order. If the Sale closes, the only parties that would receive an immediate payment are Hall with respect to its administrative claim and secured claim and Penta with respect to its administrative claim, the estate professionals employed by the Debtor and the Committee and unsecured creditors with administrative convenience claims. In any event, on balance, the harm suffered by Hall should the stay be denied (i.e., that its collateral is sold over and above its objection, stripping it of its liens and any further remedies to recover its claim) outweighs any harm suffered by the Plan Proponents by such a stay (mere delay in closing a sale transaction). Accordingly, the stay should be granted.

## H.     The Public Interest Supports Granting a Stay.

53.     The public interest factor weighs in favor of issuing a stay under these circumstances. Considerations of the public interest involve testing whether the relief requested would affect the public at large, as opposed to the immediate parties to the appeal.[44] Courts have determined that "the public interest is served in preserving the integrity of the right to appellate review[.]"[45] Indeed, the public has a strong interest in the

---

[44]   *In re Fullmer*, 323 B.R. 287, 305 (Bankr. D. Nev. 2005).

[45]   *In re SK Foods, L.P.*, No. 2:09–cv–02942–MCE, 2009 WL 5206639, at *4 (E.D.Cal. Dec.24, 2009).

appeal right as one component of the constitutional right to due process in enforcement of the nation's laws."[46]

The public interest is served by appellate review of whether the Bankruptcy Court has authority to exercise jurisdiction over non-estate property and thereby alter non-debtor rights through the Confirmation Order, and the interplay of valuation and § 1129(b)(2)(A). Such determinations will assist parties in future bankruptcy proceedings when proposing chapter 11 plans. If the Confirmation Order stands, future chapter 11 debtors may reference this case as authority to expand improper by bankruptcy jurisdiction even if to do so strips the state law rights of non-debtor parties, as the Plan Proponents have attempted to do here. Such a ruling will negatively impact the public at large. The public interest is best served by proper appellate review of the arguments raised in this Motion and the Hall Confirmation Objection.

### III.
### BOND

54.      The party that seeks an appeal must request a stay pending appeal to ensure the appeal will not be equitably moot. *See Rev Op Group v. ML Manager, LLC (In re Mortgages Ltd.),* 771 F.3d 1211, 1217 (9th Cir. 2014). If a stay pending appeal is appropriate, the appellant will likely be required to post a supersedeas bond or other surety to preserve the status quo during the appellate period. *See In re Motors Liquidation Co.,* 539 B.R. 676, 686 (Bankr. S.D.N.Y. 2015) ("The purpose of requiring a bond in this context is to indemnify the party prevailing in the original action against loss caused by an

---

[46]   *Gila River Indian Cmty. v. United States,* CV-10-1993-PHX-DGC, 2011 WL 1656486, at *3 (D. Ariz. May 3, 2011). (citing *Maine v. U.S. Dep't of Interior,* No. CIV. 00–122–B–C, 2001 WL 98373, at *4 (D.Me. Feb.5, 2001)).

unsuccessful attempt to reverse the holding of the bankruptcy court."); *see also In re Weinhold*, 389 B.R. 783, 787 (Bankr. M.D. Fla. 2008) ("The purpose of a supersedeas bond under Rule [8005] is to protect the prevailing party against any loss that might result from a stay of the judgment or order.").

55.     It is generally acknowledged that the Federal Rules of Bankruptcy Procedure provide the bankruptcy courts with discretion to grant a stay pending appeal without requiring the appellant to post a bond. *See In re Weinhold*, 389 B.R. at 787 (citing *In re Adelphia Comm'n Corp.*, 361 B.R. 337, 350 (S.D.N.Y. 2007)). The decision regarding whether or not to require a bond is discretionary with the bankruptcy court. *See id.* (citing *In re Texas Equip. Co., Inc.*, 283 B.R. 222, 229 n. 5 (Bankr. N.D. Tex. 2002). In exercising its discretion, however, the bankruptcy court must determine whether the party seeking the stay pending appeal has satisfied its burden of showing that no bond is required. *See id.* Because a supersedeas bond is designed to protect the non-appealing parties, the party seeking the stay without a bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond. *See id.* The bond requirement should not be eliminated or reduced unless doing so does not unduly endanger the appellee parties' interests in the ultimate recovery under the subject order. *See id.*

56.     In evaluating the bonding requirement, courts look to whether the bond would be necessary to protect against any diminution in the value of the subject property pending appeal and to secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal. *See In re Tribune Co.*, 477 B.R. 465, 478 (Bankr. D. Del.

2012) (cited by *Rev Op Group v. ML Manager, LLC (In re Mortgages Ltd.),* 771 F.3d 1211, 1217 (9th Cir. 2014)); *see also In re Weinhold,* 389 B.R. at 787 (citing *In re Adelphia Comm'n Corp.,* 361 B.R. at 350 (quoting *In re Sphere Holding Corp.,* 162 B.R. 639, 644 (E.D.N.Y. 1994)). The emphasis should be on preserving the status quo because the posting of a bond guarantees the costs of delay incident to the appeal. *See In re Tribune Co.,* 477 B.R. at 478. Accordingly, the amount of the bond is evaluated on a case-by-case basis and is tailored to minimize the risks facing the appellee parties under the particular circumstances.

57.     In calculating the bond in the specific context of an appeal from a bankruptcy court's order authorizing the sale of real property, the Honorable Judge Robert L. Jones in the U.S. Bankruptcy Court for the Northern District of Texas, in a well-reasoned and thorough opinion, discussed a survey of other bankruptcy courts' considerations in determining the appropriate amount of the bonding requirement.

> "The fact that the judgment concerns real property does not relieve the appealing party of the burden to provide a supersedeas bond or its equivalent. However, the <u>value of the property</u> is **not** considered the 'amount of the judgment' and is not included in the amount of the supersedeas bond."

*In re Texas Equip. Co., Inc.,* 283 B.R. 222, 229 (Bankr. N.D. Tex. 2002) (emphasis added) (citing *United States v. Route 7, Box 7091, Chatsworth Ga.,* 1997 WL 412477 *2 (N.D. Ga. 1997), *aff'd,* 117 F.3d 1433 (11th Cir.1997)).

58.     The courts that have considered the proper amount for a supersedeas bond when the judgment *res* is real property generally look to the following factors:

(a) time value of the property;

(b) the diminution in value or destruction of the property, quantified as the cost of insurance on the property;

(c) the costs the appellee parties will incur for the appeal (apparently excluding attorneys' fees);

(d) the estimated taxes on the property during the pendency of the appeal; and

(e) any other party expenses the appellee parties will incur as a result of the time delay of the appeal.

*See In re Weinhold*, 389 B.R. 783, 789 (Bankr. M.D. Fla. 2008)*; see also In re Texas Equip. Co., Inc.,* 283 B.R. at 230 (citing *Metz v. United States*, 130 F.R.D. 458, 459–60 (D. Kan. 1990) (including $500 for costs of appeal, two years of rental value of property, ad valorem taxes during appeal, and casualty and fire insurance during appeal in calculating the amount of the supersedeas bond); *Gleasman v. Jones, Day, Reavis & Pogue (In re Gleasman)*, 111 B.R. 595, 603–04 (Bankr. W.D. Tex. 1990) (including potential diminution in value of the real property and the time value of the property in calculating amount of bond); *In re Burkett*, 279 B.R. 816, 817 (Bankr. W.D Tex. 2002) (listing insurance, time value of property, and non-appellant's costs on appeal in setting the amount of the bond)).

59.    The calculation of a bond in a case involving a non-monetary judgment is intended to serve as an estimate of the potential loss that may result during the pendency of the subject appeal.  *See In re Weinhold*, 389 B.R. at 789. The *Weinhold* Court looked to the terms of the parties' underlying agreement to determine an appropriate measure of the appellees' interests in the subject property during the appeal. *See id*. The best determination of the various damages that may be suffered by the appellee parties is the

time value of the delay sustained by appellees in not being able to immediately implement the terms of the contract at issue in the appeal. *See id.* at 790.

60.     In this case if the Court grants a stay of the Confirmation Order, the sale to Lawrence Investments will not close. The real property will remain with the Debtor. The value of the real property will not be lost but will continue to secure the liens of the lienholders like Hall, Ladera and Penta. In the event that Hall is not successful on the appeal, what are the potential damages to the prevailing parties? The Debtor will still own the real property. Lawrence Investments at that time can still close on its purchase or the property can be sold to someone else under the Amended Plan. There were other interested buyers in this case just none willing to outbid Lawrence. The plans proposed by Penta and Ladera, which were essentially outbid by Lawrence, proposed to pay over $35 Million for the property. Under any subsequent sale, there will still be sufficient value from the sale to fund a Plan Payment and Lien Litigation Reserve. The only party hurt if a sale is approved for less than the current plan is Hall since Hall just gets what is left of the Purchase Price. If the sale is stayed, the property will still need to be maintained. Hall has maintained the property since the bankruptcy case was commenced through the time of the confirmation hearing. If the Court grants a stay, Hall will agree to continue to pay the necessary costs to maintain and secure the property including taxes, insurance, security, and utilities which currently are running about $50,000 a month. That will preserve the status quo and serve as an effective bond. The Declaration of Donald L. Braun [Bankruptcy Case Docket No. 989] is attached as **Exhibit "6"**. Alternatively, Hall could

1   post a bond in the amount of those costs or in such other amount as the Court

2   determines.

3       **WHEREFORE, PREMISES CONSIDERED**, Hall respectfully requests that

4
5   the Court should enter an order staying the Confirmation Order and the Modification

6   Order, and grant Hall such other and further relief to which it may be justly entitled.

7   DATED: October 23, 2017               Respectfully submitted,

8                                              **GARDERE WYNNE SEWELL LLP**

9

10                                           By: */s/ Frank J Wright*_____

11                                             Frank J. Wright (TX Bar No. 22028800)
                                             *(by pending pro hac vice)*

12

13                                         2021 McKinney Avenue
                                           Suite 1600

14                                         Dallas, Texas 75201

15                                         Telephone:   (214) 999.3000
                                           Facsimile:   (214) 999.4667 - fax

16                                         Email:         fwright@gardere.com

17                                              and

18

19                                    **FAHRENDORF, VILORIA, OLIPHANT
                                            & OSTER L.L.P.**

20

21                                    By: */s/ Nathan J. Aman*_____
                                           Nathan J. Aman (NV Bar No. 8354)

22                                    P.O. Box 62

23                                    Reno, Nevada 89505
                                      Telephone:   (775) 284-8888

24                                    Facsimile:   (775) 284-3838

25                                    Email:         naman@renonvlaw.com

26                                  **ATTORNEYS FOR HALL CA-NV, LLC**

27

28

## CERTIFICATE OF SERVICE

I the undersigned, hereby certify that on the 23rd day of October, 2017, the foregoing document was served on all parties consenting to electronic service in this case *via* the Court's *CM/ECF* system of the District Court.

*/s/ Alexandra P. Schroeder*

The foregoing document has been delivered by other means to:

Eric Goldberg
DLA Piper LLP (US)
Suite 400 North Tower
2000 Avenue of the Stars
Los Angeles, CA 90067

John Fiero
Fennemore Craig, P.C.
150 California Street, 15th Floor
San Francisco, CA 94111

Paul Wassgren
DLA Piper LLP(US)
Suite 400 North Tower
2000 Avenue of the Stars
Los Angeles, CA 90067

Shirley Cho
Fennemore Craig, P.C.
150 California Street, 15th Floor
San Francisco, CA 94111